# 20-11232

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

## UNITED STATES OF AMERICA,
Plaintiff-Appellee

v.

## MAYELI MOLINA,
Defendant-Appellant

---

On Appeal from the United States District Court
For the Northern District of Texas
Dallas Division
District Court No. 3:17-CR-341-B

---

## APPELLEE'S BRIEF

---

Prerak Shah
Acting United States Attorney

Suzanna O. Etessam
Assistant United States Attorney
Texas Bar No. 17572420
1100 Commerce Street, 3rd Floor
Dallas, Texas 75242
Telephone: 214-659-8643
Suzanna.Etessam@usdoj.gov


Attorneys for Appellee

## **STATEMENT REGARDING ORAL ARGUMENT**

Oral argument is not necessary to resolve Molina's three issues on appeal.  First, Molina complains the district court plainly erred when it failed to give a cautionary instruction during the testimony of six government witnesses on their dual roles as expert and fact witnesses, but Molina fails to identify any statements that required such an instruction.  Second, Molina alleges the court procedurally erred when it determined the drug quantity based upon two coconspirators' testimony that was corroborated and unrebutted.  Finally, Molina claims the district court imposed a trial penalty when it sentenced her 292 months' imprisonment, which was the bottom of the guideline range.  The court, however, properly considered her conduct and lack of remorse after sitting through a four-day trial and determined she merited a bottom-of-the-guidelines sentence.  Oral argument, therefore, would not materially assist the Court in resolving this appeal.

# **TABLE OF CONTENTS**

**Page**

STATEMENT REGARDING ORAL ARGUMENT.....................................i

TABLE OF AUTHORITIES ..........................................................v

STATEMENT OF JURISDICTION.............................................1

STATEMENT OF THE ISSUES ................................................1

STATEMENT OF THE CASE....................................................2

    1.    Drug Enforcement Administration agents investigating a drug trafficking organization identify Mayeli Molina as a kilogram-quantity customer. ...................................................................2

    2.    At trial, both CW1 and CW2 testify to methamphetamine transactions with Mayeli Molina; she takes the stand and denies knowing the package she collected in April from CW1 contained methamphetamine and denies receiving methamphetamine from CW2. ......................................................................................4

        a.    CW1 testifies to delivering a kilogram of methamphetamine to Molina on April 21, 2017. .............................................4

        b.    CW2 testifies to delivering methamphetamine to Molina on multiple occasions, and the texts and photos on Molina's phone corroborate his testimony........................................5

        c.    Molina testifies and admits she met with CW1 but denies knowing that the package she collected was methamphetamine. ...........................................................7

    3.    The district court sentences Molina to a bottom-of-the-guidelines sentence of 292 months' imprisonment. ......................................8

SUMMARY OF THE ARGUMENT......................................... 11

ARGUMENT AND AUTHORITIES....................................... 11

**Page**

1.    The district court did not plainly err in allowing six government witnesses to testify without a cautionary instruction on their dual role, and Molina fails to identify any statements that required such an instruction. ........................................................................ 13

    A.    Molina fails to establish the first prong of plain-error review because the district court did not err in not providing a cautionary instruction about several witnesses' allegedly dual roles as fact and expert witnesses............................. 14

        i.    Task Force Officer Johnny Sosa, the case agent, testified to lay opinions based on his extensive involvement in the investigation. ............................ 17

        ii.    DEA Special Agent Dave Phillips provided lay opinion testimony based on his participation in the investigation. ......................................................... 18

        iii.    DEA Special Agent Steve McBain testified as a fact witness. ................................................................. 18

        iv.    Elsa Carreon testified as a linguist after the government established a proper foundation for her expertise................................................................. 19

        v.    The government properly qualified Mark Mize as an expert in downloading cell phones.......................... 21

        vi.    Priscilla Thomas was properly qualified to analyze phone records....................................................... 21

    B.    Molina fails to show clear and obvious error. ................... 22

    C.    Molina cannot show that her substantial rights were affected by the district court's decision not to provide sua sponte a cautionary instruction. .................................................... 23

**Page**

2.    The district court did not procedurally err in determining the drug quantity and purity based, in part, on the coconspirators' testimony. ............................................................................... 24

3.    The district court did not impose a trial penalty when it sentenced Molina to a bottom-of-the-guidelines sentence........................... 28

CONCLUSION...................................................................................... 32

CERTIFICATE OF SERVICE .................................................................. 33

CERTIFICATE OF COMPLIANCE  ......................................................... 33

# TABLE OF AUTHORITIES

**Federal Cases**                                                          **Page(s)**

*Alabama v. Smith*, 490 U.S. 794 (1989)............................................................ 30

*Puckett v. United States*, 556 U.S. 129 (2009) ................................................. 22

*United States v. Akins*, 746 F.3d 590 (5th Cir. 2014) ....................................... 20

*United States v. Alaniz*, 726 F.3d 586 (5th Cir. 2013) ...................................... 28

*United States v. Alford*, 142 F.3d 825 (5th Cir. 1998) .................................24, 25

*United States v. Aparicio*, 963 F.3d 470 (5th Cir.) ........................................... 27

*United States v. Arayatanon*, 980 F.3d 444 (5th Cir. 2020).............................. 25

*United States v. Betancourt*, 422 F.3d 240 (5th Cir. 2005) .................... 25, 26, 28

*United States v. Bolton*, 908 F.3d 75 (5th Cir. 2018)........................................ 18

*United States v. Dinh*, 920 F.3d 307 (5th Cir. 2019)......................................... 27

*United States v. El-Mazain*, 664 F.3d 467 (5th Cir. 2011) ................................ 15

*United States v. Gonzalez-Rodriguez*, 621 F.3d 354 (5th Cir. 2010)................... 23

*United States v. Gozes-Wagner*, 977 F.3d 323 (5th Cir. 2020) ...........28, 29, 30, 31

*United States v. Haines*, 803 F.3d 713 (5th Cir. 2015) ..................................... 14

*United States v. Harris*, 702 F.3d 226 (5th Cir. 2012) ...................................... 28

*United States v. Hull*, 160 F.3d 265 (5th Cir. 1998)......................................... 22

*United States v. Johnson*, 679 F.2d 54 (5th Cir. 1982)...................................... 29

*United States v. Kalu*, 936 F.3d 678 (5th Cir. 2019) ........................................ 22

*United States v. Lopez-Medina*, 461 F.3d 724 (6th Cir. 2006)........................... 23

*United States v. Medina*, 161 F.3d 867 (5th Cir. 1998) .................................... 25

*United States v. Montes-Salas*, 669 F.3d 240 (5th Cir. 2012)............................ 13

## Federal Cases, continued                                      Page(s)

*United States v. Rodriguez*, 666 F.3d 944 (5th Cir. 2012) ................................. 27

*United States v. Sanders*, 942 F.2d 894 (5th Cir. 1991) .................................... 25

*United States v. Walker*, 688 F.3d 416 (8th Cir. 2012)..................................... 27

*United States v. Washington*, 44 F.3d 1271 (5th Cir. 1995) ............................. 16

*United States v. Watson*, 966 F.2d 161 (5th Cir. 1992) .................................... 24

*United States v. Whitelaw*, 580 F.3d 256 (5th Cir. 2009)................................. 28

*United States v. Yanez Sosa*, 513 F.3d 194 (5th Cir. 2008) .............................. 15

## Federal Statutes and Rules

Fed. R. App. P. 4(b) ....................................................................................... 1

Fed. R. Evid. 701 ......................................................................................... 15

## Federal Sentencing Guidelines

USSG § 2D1.1, comment. (n.12) ................................................................. 26

USSG § 2D1.1(c), n.(C)................................................................................ 27

## STATEMENT OF JURISDICTION

This is a direct appeal from a conviction and sentence in a criminal case. The district court had jurisdiction under 18 U.S.C. § 3231, and this Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). The district court entered judgment on December 14, 2019, and Molina timely filed her notice of appeal on December 19, 2019. Fed. R. App. P. 4(b). (ROA.365-66, 368-74.)

## STATEMENT OF THE ISSUES

1.    Did the district court plainly err when it failed to give a cautionary instruction during six government witnesses' testimony, when Molina fails to identify any statements requiring such an instruction?

2.    Did the district court procedurally err when it based its drug quantity and purity findings on the testimony of two cooperating witnesses when that testimony was corroborated and unrebutted?

3.    Did the district court impose a trial penalty when it sentenced Molina to the bottom of the guideline range, which is presumptively reasonable, especially after the court sat through a four-day trial where Molina provided an implausible story and showed a lack of remorse through sentencing?

## STATEMENT OF THE CASE

**1.    Drug Enforcement Administration agents investigating a drug trafficking organization identify Mayeli Molina as a kilogram-quantity customer.**

In January 2017, the Drug Enforcement Administration in Dallas began investigating a methamphetamine trafficking organization.  (ROA.613.)  On April 12, 2017, DEA agents received court-authorization to intercept cooperating witness 1's ("CW1's") telephone.  (ROA.615.)  On April 21, 2017, agents intercepted a series of texts and calls between CW1 and a female, who picked up a kilogram of methamphetamine.  (ROA.629-30.)  Although the agents did not witness the transaction, they knew, through the interceptions, that the female was a customer's niece and that she drove a gold Tahoe to meet CW1 and collect a kilogram of methamphetamine.  (ROA.631-32, 636.)

The agents then sought and received court authorization to ping the female's phone number.  (ROA.631, 635-36.)  Agents conducted surveillance at a home where the phone was pinging and saw a female leave in a gold Tahoe.  (ROA.635-36.)  As the female traveled away from the home, the ping followed her, confirming that she was carrying the phone.  (ROA.637.)  The vehicle was registered to Mayeli Molina.  (ROA.637-38.)  Agents obtained Molina's photo and confirmed she was the one carrying the phone.  (ROA.637-38.)

On June 16, 2017, agents arrested CW1, and he agreed to cooperate. (ROA.639-40.) CW1 told the agents that he met his customer's niece, Molina, at a parking lot to deliver a kilogram of methamphetamine. (ROA.641.) (ROA.642.) CW1 also admitted delivering methamphetamine to Molina's uncle, "Cristian," on three occasions, with Molina collecting the methamphetamine the final time. (ROA.642-44.) Agents later identified "Cristian" as Octavio Molina. (ROA.644.)

Agents arrested Mayeli Molina in October 2017, after she left her home driving the gold Tahoe. (ROA.753, 859.) The agents, with Molina in custody, returned to her home. (ROA.714, 754.) There, agents informed Molina of her constitutional rights, and she agreed to speak to them. (ROA.719-22.) The interviewing agent recorded the conversation on his iPhone. (ROA.723.) Molina also consented to a search of her home, her vehicle, and her phone. (ROA.727-29, 754-55.) An inspection of her phone revealed photos of money, receipts for cash deposits, and money transfers. (ROA.730-31, 761-68.)

Later, Molina's phone was downloaded, and the report generated was provided to a DEA intelligence analyst. (ROA.776-779, 785-92, 839.) The analyst observed texts on Molina's phone with CW2, who was identified as a methamphetamine distributor in a separate investigation. (ROA.840-41.)

2.    **At trial, both CW1 and CW2 testify to methamphetamine transactions with Mayeli Molina; she takes the stand and denies knowing the package she collected in April from CW1 contained methamphetamine and denies receiving methamphetamine from CW2.**

    a.    **CW1 testifies to delivering a kilogram of methamphetamine to Molina on April 21, 2017.**

At trial, CW1 testified that on April 21, 2017, he communicated with his customer "Cristian," who told CW1 that his niece would be collecting a kilogram of methamphetamine for him because he was traveling to Mexico. (ROA.1046-48, 1053, 1058-59.)  CW1 then received a text from the niece asking where and what time to meet, and CW1 responded with an address and time.  (ROA.1054-56.)  CW1, concerned about meeting the niece, spoke to Cristian, asking whether she was trustworthy.  (ROA.1056-57.)  Cristian assured CW1 that he could trust his niece, Mayeli Molina.  (ROA.1058-59.) CW1 and Molina then engaged in a series of texts discussing the time to meet and describing the vehicles they were in.  (ROA.1059-60.)

When Molina arrived at the location, CW1 was waiting for her with the methamphetamine.  (ROA.1063-64.)  The price for the kilogram was $6,800, but Molina only had $6,700.  (ROA.1064-65.)  CW1 contacted his boss in Mexico to ask whether he should tender the methamphetamine to Molina despite the missing $100.  (ROA.1065-66, 1068.)  The Mexican boss initially said no, but after a series of texts, the boss relented and allowed CW1 to give

Molina the methamphetamine but directed CW1 to document that Molina owed $100.  (ROA.1068-70.)  CW1 then gave the drugs to Molina—which were in a clear plastic bag inside a gift bag.  (ROA.1079-81.)  Molina peeked inside the gift bag upon receiving it.  (ROA.1079-81.)

Once at home, CW1 put the payment from Molina through a money counter, and it was short another $20.  (ROA.1078.)  CW1 and Molina engaged in another series of texts, and Molina informed CW1 that she would tell her uncle that he owed $120 for the methamphetamine she received that night, along with another $20 from a previous drug sale.  (ROA.1083, 1087-88.)  CW1 documented the drug sale with Molina in a drug ledger, which was introduced as an exhibit at trial.  (ROA.1102-03.)  The drug ledger reflected other entries for previous drug sales to Molina's uncle.  (ROA.1105.)

> **b.** **CW2 testifies to delivering methamphetamine to Molina on multiple occasions, and the texts and photos on Molina's phone corroborate his testimony.**

Cooperating witness 2 ("CW2")  testified at trial that he was serving a 140-month prison sentence for drug trafficking.  (ROA.1128-30.)  Before his arrest in January 2018, CW2's sister introduced him to Molina in June or July 2017.[1]  (ROA.1132-34.)  Molina lived a couple of houses away from CW2's family's home.  (ROA.1133.)  CW2 testified that when he met Molina, he was

---

[1] This was after CW1's arrest in June 2017.

receiving methamphetamine from Mexico in liquid form that he was converting into crystal methamphetamine. (ROA.1134-35.)

Several weeks after meeting Molina, CW2 began selling her kilograms of methamphetamine for six to seven thousand dollars per kilogram. (ROA.1139-40, 1144.) Molina first asked for two to three kilograms, which he delivered to her at her home. (ROA.1140-41.) Texts on Molina's phone, where she requested "two pieces" and "materials" from CW2, corroborated CW2's testimony. (ROA.1146-48.) Molina purchased methamphetamine from CW2 on multiple occasions. (ROA.1150-51, 1156-58.) Sometimes, Molina would call or text her uncle, Octavio Molina, while texting CW2. (ROA.1148, 1152.) CW2 testified that one time when he delivered methamphetamine to Molina at her home, her husband and uncle were there, and CW2 counted the money for the drugs in their presence. (ROA.1149, 1153-54, 1169.)

Once Molina and CW2 established a relationship, CW2 began fronting (providing on consignment) methamphetamine to Molina. (ROA.1154.) Texts on Molina's phone asked CW2 for his bank account numbers so that she could pay for the drugs she owed. (ROA.1156-57.) A photo on Molina's phone reflected a bank deposit receipt for $5,500 to CW2's account made on the day he texted her the account number. (ROA.1160-61.) CW2 stopped

distributing methamphetamine to Molina after she was arrested in October

2017.  (ROA.1162.)  Altogether, CW2 delivered methamphetamine to Molina

over three times.  (ROA.1181.)

> ### c.    Molina testifies and admits she met with CW1 but denies knowing that the package she collected was methamphetamine.

At trial, Molina's husband, Jose Mendoza, testified that his wife's

cousin, Octavio Molina, had diabetes and frequently asked Molina for favors.

(ROA.866, 869-70.)  Octavio Molina would use Molina's phone and had a key

to their home.  (ROA.870-71.)  Mendoza denied knowing CW2 and admitted

that Octavio Molina had been arrested sometime before Molina.  (ROA.872,

876.)

Molina then testified and identified Octavio Molina as her uncle, who

had severe diabetes.  (ROA.882-83.)  According to Molina, her uncle, despite

having two phones of his own, would frequently use Molina's phone and ask

her to send text messages for him.  (ROA.888, 893, 895.)  Because of his poor

health, Octavio Molina also asked Molina for favors.  (ROA.884.)

Specifically, in April 2017, Molina's uncle asked her to deliver a small

bag for him, which he said held clothes.  (ROA.884-85.)  Molina then

communicated with CW1 and later met him at a parking lot to deliver the bag.

(ROA.908.)  Molina had not previously met CW1.  (ROA.888-90, 910-12.)

Molina remained in her car, while CW1, in his car, counted the money in the

bag that Molina gave him. (ROA.888-90, 910-12.) CW1 then told Molina to call her uncle because she was short $100. (ROA.888-90, 910-12.) After unsuccessfully attempting to call her uncle, CW1 gave Molina a gift bag. (ROA.890-91.) CW1 also told Molina to tell her uncle that he owed $100. (ROA.890-91.) Molina returned to her home with the gift bag from CW1 and put it on a table. (ROA.924.) At some point, her uncle collected it. (ROA.925-26.)

Molina testified that after meeting with CW1, she engaged in another series of texts with him that night where he complained that the money Molina delivered was short $120, rather than $100, and that her uncle owed $20 from a previous transaction for a total debt of $140. (ROA.892, 912-14.)

Molina denied knowing she was committing a crime and testified she would not have collected the bag for her uncle had she known it was methamphetamine. (ROA.891.) Molina also denied participating in other drug deals and claimed that her uncle used her phone to text CW2. (ROA.907, 916-20.)

The jury rejected Molina's testimony and found her guilty. (ROA.994.)

### 3.    The district court sentences Molina to a bottom-of-the-guidelines sentence of 292 months' imprisonment.

After the guilty verdict, the district court ordered a presentence investigation report (PSR). (ROA.310-12.) The PSR held Molina accountable

for 13 kilograms of ice methamphetamine: one kilogram from CW1 and 12 kilograms from CW2. (ROA.1406, 1413-14.) The PSR relied on CW2's trial testimony that he delivered between two to seven kilograms of methamphetamine on at least three occasions and conservatively determined that Molina received approximately four kilograms from CW2 three times. (ROA.1413.) In arriving at this drug quantity, the PSR referred to USSG § 2D1.1, comment. (n.5), which states, "where there is no drug seizure or the amount seized does not reflect the scale of the offense, the Court shall approximate the quantity of the controlled substance." The PSR also noted that agents found CW2 in possession of methamphetamine with a purity level of over 80%. (ROA.1414.)

The PSR calculated Molina's base offense level at 38. (ROA.1415.) She received another two levels because the methamphetamine was imported from Mexico, resulting in an adjusted offense level of 40. (ROA.1415.) With a criminal history category of I, Molina faced a guideline range of 292-365 months. Molina did not receive a reduction for acceptance of responsibility because she denied her guilt at trial and during the PSR interview. (ROA.1414.) Molina filed several objections to the PSR: she objected to the drug quantity, to the drug purity, and to the importation enhancement. (ROA.1423-24.)

At sentencing, Molina argued that she should be held responsible for five kilograms of methamphetamine because her uncle had a key to her home, and she was not always present when CW2 delivered methamphetamine. (ROA.1009.)  The government, in response, referred to CW2's trial testimony that he dealt specifically with Molina on multiple occasions and distributed up to seven kilograms to her at a time.  (ROA.1010.)  The district court overruled the objection to the drug amount.  (ROA.1011.)

Molina also asserted that the court should use a mixture of methamphetamine as opposed to ice methamphetamine.  (ROA.1011.)  The government responded citing CW2's testimony that he received methamphetamine from Mexico and converted it to ice or crystal methamphetamine.  (ROA.1012.)  The court overruled this objection, too. (ROA.1013.)  Molina then argued that she should receive a reduction for acceptance of responsibility, which the court overruled.  (ROA.1014.)

Molina asked the court to impose a 10-year sentence because Molina had experienced abuse from her uncle.  (ROA.1016-19.)  Molina also alleged that her uncle harassed her, threatened her, and threatened her family. (ROA.1022.)  The district court noted that Molina failed to mention this abuse during her PSR interview.  (ROA.1021.)

In determining an appropriate sentence, the district court referred to many letters of support submitted for Molina. (ROA.1108.) But the court found that Molina lied to the investigators when they first questioned her and that she lied under oath at trial, which merited a sentence at the bottom of the guidelines:

> But, you know, the – the testimony at trial was key for me, because you were just still lying to everybody… But I still don't believe you. I think you're sorry right now, you're very sorry, you're asking for clemency, but you haven't shown me anything to deserve that.
>
> But you're not telling us the truth, and so – I don't think you've accepted responsibility either. So to promote respect for the law, provide just punishment, all of the 3553 factors that are in play, your role in the offense, the offense, itself, kilograms of methamphetamine, I think you deserve 292 months. That's the low end of the guidelines.

(ROA.1031.) The court also imposed a five-year term of supervised release. (ROA.1032.)

## **SUMMARY OF THE ARGUMENT**

Molina argues the district court plainly erred when it allowed six witnesses to testify as both expert and fact witnesses without a sua sponte cautionary instruction on the witnesses' dual roles. But Molina fails to identify any statements that required a cautionary instruction. Two DEA agents briefly provided lay opinion testimony based on their extensive involvement in the investigation. One witness testified as a fact witness, and three witnesses provided expert testimony after being properly qualified. The district court did

not plainly err when it allowed these witnesses to testify in the manner they did. Even if this Court, nevertheless, found the district court should have given a cautionary instruction during the witnesses' testimony, that error does not rise to the level of affecting Molina's substantial rights.

Molina complains that the district court erred when it based the drug quantity and drug purity on two cooperating witnesses' testimony, but that testimony was corroborated and unrebutted. Moreover, both cooperating witnesses were found in possession of methamphetamine with a purity higher than 80%. The district court did not procedurally err when it inferred that the unseized drugs distributed to Molina had the same purity as the drugs seized from her suppliers.

Molina alleges the district court imposed an unconstitutional trial penalty when it sentenced her to a bottom-of-the-guidelines sentence. The district court, however, presided over a four-day jury trial—during which Molina testified and lied—before sentencing Molina. Although the district court, at sentencing, referenced Molina's decision to go to trial and forego a favorable plea offer, the district court did so simply to explain why she was receiving the sentence, not because she exercised her right to a trial. Molina received a bottom-of-the-guidelines sentence, which enjoys a presumption of

reasonableness—and Molina fails to show her sentence amounts to an impermissible trial penalty.

## ARGUMENT AND AUTHORITIES

**1.    The district court did not plainly err in allowing six government witnesses to testify without a cautionary instruction on their dual role, and Molina fails to identify any statements that required such an instruction.**

### Standard of Review

Molina complains that the district court plainly erred when it allowed six government witnesses to testify as fact and expert witnesses without a cautionary instruction on the witnesses' dual role.  (Brief at 12-14.)  Molina concedes that she did not object to this issue at trial and that plain-error review applies.  (Brief at 12.)

To establish plain error, the defendant must show (1) error, (2) that is plain, and (3) that affected her substantial rights.  An error is "plain" only if it is "so clear or obvious that the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." *United States v. Montes-Salas*, 669 F.3d 240, 247-48 (5th Cir. 2012).  Moreover, a defendant must show that the error not only prejudiced her but affected her substantial rights.  *Id.*  "Error is prejudicial if there is a reasonable probability that the result of the proceedings would have been different but for the error." *Id*.  And even if a defendant establishes the first three elements, this Court may

exercise its discretion to correct the error only if the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* A defendant faces a difficult hurdle "satisfying the requirements of plain error review." *Id.*

## Discussion

### A.    Molina fails to establish the first prong of plain-error review because the district court did not err in not providing a cautionary instruction about several witnesses' allegedly dual roles as fact and expert witnesses.

Molina complains that the court, without objection, failed to give sua sponte a cautionary instruction about several witnesses' allegedly dual roles during their testimony, but she fails to identify the witnesses' statements that fall within the ambit of expert testimony that would warrant a cautionary instruction.

In *United States v. Haines*, 803 F.3d 713, 732 (5th Cir. 2015), this Court discussed the safeguards sufficient to ensure that a witness's dual role does not prejudice or confuse the jury. *Id.* These include "requiring the witness to testify at different times, in each capacity; giving a cautionary instruction to the jury regarding the basis of the testimony; allowing for cross-examination by defense counsel; establishing a proper foundation for the expertise; or having counsel ground the question in either fact or expertise while asking the question." *Id.*

14

The witnesses Molina identifies testified appropriately by either (1) providing lay opinion testimony based on their extensive involvement in the investigation; or (2) testifying as fact witnesses; or (3) testifying as experts after the government established a proper foundation for their expertise. *See United States v. El-Mazain*, 664 F.3d 467, 514 (5th Cir. 2011); *see also United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008) (holding that a law enforcement officer does not provide expert testimony if it is "merely descriptive," or if it is based on "common sense or the officer's experience formed from firsthand observation"). Moreover, the district court instructed the jury that it should judge each of these witnesses' testimony to determine whether to accept the witness's opinions. The jury was further instructed that it could accept or reject the complained-of testimony or give it as much weight as it deemed appropriate, "considering the witness's education and experience, the soundness of the reasons given for the opinion, and all other evidence in the case." (ROA.299-300.) The district court did not err in not giving a cautionary instruction while the witnesses testified.

The six witnesses about whom Molina complains primarily provided lay opinion testimony. *See* Fed. R. Evid. 701. This Court has held that "[t]he rule is well-established that an experienced narcotics agent may testify about the significance of certain conduct or methods of operation unique to the drug

15

distribution business, as such testimony often is helpful in assisting the trier of fact understand the evidence." *United States v. Washington*, 44 F.3d 1271, 1283 (5th Cir. 1995). For example, in *United States v. El-Mezain*, 664 F.3d 467, 513 (5th Cir. 2011), this Court permitted agents to testify to facts not "known to an average lay person," finding that the "agents' opinions were limited to their personal perceptions from their investigation" of the case. *Id.* There, the defendants argued that two FBI agents gave improper expert opinions. *Id.* This Court allowed the testimony, finding it "need not be excluded as improper lay opinion, even if some specialized knowledge on the part of the agents was required, if it was based on first-hand observations in a specific investigation." *Id.* at 514. The Court further noted that "[b]y explaining the meaning of terms as used in the conversations and documents, as well as the relationships between the people they were investigating, the agents provided the jury with relevant factual information about the investigation." *Id.*

Similarly, as shown *infra*, two witnesses in Molina's case—Officer Sosa and Special Agent Phillips—properly testified to the methods of the drug distribution business or to opinions limited to their personal perceptions from their investigation in the case. Another witness—Special Agent McBain— testified as a fact witness, and three witnesses—Elsa Carreon, Mark Mize, and

Priscilla Thomas—testified as expert witnesses after being properly qualified. Therefore, Molina has shown no error.

> ### i. Task Force Officer Johnny Sosa, the case agent, testified to lay opinions based on his extensive involvement in the investigation.

First, Task Force Officer Johnny Sosa appropriately testified to his personal participation in the investigation. (ROA.615-66.) On direct examination, Officer Sosa testified that he worked as a Fort Worth police officer from 1990 to 2018, when he retired. (ROA. 610.) Officer Sosa described the training he received with the Fort Worth Police Academy and as a task force officer with the DEA. (ROA.611.) While with the DEA, Officer Sosa investigated large-scale drug trafficking organizations, and he described the techniques agents commonly used, including surveillance, confidential informants, undercover agents, electronic surveillance, pole cameras, pen registers, tracking devices, and wiretaps. (ROA.611-12.) Officer Sosa was the case agent investigating the drug organization involving Molina, and he employed those investigative techniques in Molina's case. (ROA.612-14.)

While Molina has failed to identify which part of Officer Sosa's testimony she considers to be expert testimony, she solicited expert-type testimony from Officer Sosa on cross-examination. Specifically, Molina asked about the general nature of drug organizations and how they operate. (ROA.669-72.) A

"defendant may not complain on appeal of errors that he himself invited or provoked the [district] court ... to commit." *United States v. Bolton*, 908 F.3d 75, 92 (5th Cir. 2018) (citations omitted). Therefore, Molina has shown no error in Officer Sosa's testimony.

### ii. DEA Special Agent Dave Phillips provided lay opinion testimony based on his participation in the investigation.

Molina likewise complains about DEA Special Agent Dave Phillips's testimony, again without citing any specific statements that could be considered expert testimony. (Brief at 12.) Agent Phillips testified that he had 23 years' experience working drug conspiracies as a DEA agent. (ROA.854-55.) Agent Phillips participated in the investigation targeting Molina and her coconspirators, and on direct examination, he discussed his responsibilities and activities. (ROA.856-59.) Agent Phillips also mentioned that drug dealers do not always change phones and that a kilogram qualifies as a distributable amount. (ROA.860, 63.) Because Agent Phillips's opinions were based on his participation in the investigation, Molina has failed to establish any error in his testimony.

### iii. DEA Special Agent Steve McBain testified as a fact witness.

Molina also claims that DEA Special Agent Steve McBain testified as an expert witness. However, his testimony was purely factual. Special Agent McBain testified that he attended the DEA Language School to learn Spanish

and spent six years in Lima, Peru, as a DEA agent. (ROA.707-08.) Agent McBain was one of the agents who participated in the investigation, and he explained his responsibilities as a supporting agent. (ROA.709-12.) Agent McBain interviewed Molina after her arrest and recorded the interview on his government-issued iPhone. (ROA.717-24.) During this interview, Agent McBain asked for permission to search Molina's home, vehicle, and phone. (ROA.726-30.) Agent McBain did not express any expert opinions, and his testimony was limited to his participation in the investigation. Molina fails to identify any statements Agent McBain made that would qualify as expert testimony requiring a cautionary instruction.

### iv.   Elsa Carreon testified as a linguist after the government established a proper foundation for her expertise.

Elsa Carreon testified that she was a Spanish linguist for a Virginia company, "MVM," and that she was stationed at the DEA Dallas office. (ROA.681-82.) Ms. Carreon testified that Spanish was her first language and that she had spent 11 years transcribing and translating communications from Spanish to English for the DEA. (ROA.683-84.) Having been bilingual all her life, Ms. Carreon could read and write in both English and Spanish and was certified as a translator-transcriber through ALTA. (ROA.684.) To obtain this certification, Ms. Carreon was regularly tested. (ROA.65-86.) Using this

background, the government properly qualified Ms. Carreon as a Spanish linguist.

Ms. Carreon also testified to her participation in the investigation. This included working the wire room. (ROA.687-90.) She explained how, as a monitor of the wire interceptions, she was responsible for minimizing privileged calls and providing real-time translations of the interceptions to the agents. (ROA.686-90, 693.) To fulfill these duties, Ms. Carreon was required to know the targets' names and voices. (ROA.688, 692.)

Molina does not allege that the transcripts Ms. Carreon provided were inaccurate or that she was not qualified to make the translations. To the extent Molina takes issue with Ms. Carreon's testimony about code words used by the investigation's targets and her explanation that drug organizations sometimes use common code words, (ROA.693-94), her argument is unfounded. This Court has "recognized that testimony about the meaning of drug code words can be within the proper ambit of a lay witness with extensive involvement in the underlying investigation." *United States v. Akins*, 746 F.3d 590, 599 (5th Cir. 2014). As such, Ms. Carreon's testimony regarding code words was proper considering her extensive experience, training, and involvement in the investigation. Thus, as with the other witnesses, Molina has shown no error.

### v. The government properly qualified Mark Mize as an expert in downloading cell phones.

Mark Mize—whom Molina also claims gave inappropriate testimony—testified as a properly qualified expert. Specifically, Mize testified that he had been in the Air Force since 1998 and had been working with the Texas Joint Counterdrug Task Force for over 10 years. (ROA.774-75.) He also testified to his training and certification in the use of Cellebrite phone extraction software. (ROA.775.) The government qualified Mr. Mize as an expert using the Cellebrite technology, and his testimony was limited to explaining how he used that technology to extract the information from Molina's phone. (ROA.776-83.) After downloading Molina's phone, Mr. Mize provided the Cellebrite report to the investigating agents. (ROA.776-83.) Mr. Mize's testimony was limited to his credentials and to extracting the data from Molina's phone, and he did not provide any inappropriate expert testimony. As such, the district court was not required to provide a sua sponte cautionary instruction.

### vi. Priscilla Thomas was properly qualified to analyze phone records.

Priscilla Thomas, the final witness Molina about whom she complains, was an intelligence analyst with DEA during the investigation. (ROA.805.) Thomas explained her duties and described the assistance she provided to the investigating agents in this case. (ROA.807-08.) Thomas obtained subscriber

21

and toll records for the various phones involved in the investigation, including Molina's.  (ROA.808-14.)  Using DEA specialized software, Thomas analyzed the phone records in the case and created charts showing connections between the phones and the chronology of calls between Molina, her uncle, and CW1.  (ROA.806-07, 832-36.)  After receiving the Cellebrite report from Molina's phone, Thomas also alerted the agents to the texts and calls between Molina and CW2.  (ROA.839-42.)  In sum, the government properly laid the foundation for Ms. Thomas's testimony and her analysis of the phone records, and the district court did not err in not providing a sua sponte cautionary instruction during her testimony.[2]

## B.    Molina fails to show clear and obvious error.

Further, even if this Court were to conclude that the district court erred, any error in the district court's decision would not have been "clear or obvious, rather than subject to reasonable dispute."  *Puckett v. United States*, 556 U.S. 129, 135 (2009).  An error cannot be plain in the absence of "controlling law." *United States v. Kalu*, 936 F.3d 678, 681 n.5 (5th Cir. 2019); *see also United States v. Hull*, 160 F.3d 265, 272 (5th Cir. 1998) ("Because [the defendant]'s theory

---

[2] Molina's sole objection to Thomas's testimony did not address her role as an expert but, rather, challenged its admissibility as hearsay.  (ROA.819.)  The court then allowed Molina to voir dire Thomas.  (ROA.819.)  On voir dire, Thomas explained how she received the phone numbers she used to generate the charts she created.  (ROA.820-21.)  The court overruled Molina's hearsay objection and admitted the charts Thomas produced into evidence.  (ROA.821.)

requires the extension of precedent, any potential error could not have been 'plain.'").

The law in this area is "clear or obvious," though it cuts directly against Molina's position, as discussed *supra* in Section 2.A.  To support her argument that the district court plainly erred, Molina relies entirely on a Sixth Circuit case, which she mistakenly attributes to this Court: *United States v. Lopez-Medina*, 461 F.3d 724 (6th Cir. 2006).  The Sixth Circuit, in *Lopez-Medina*, found "that permitting police officers to testify as experts in their own investigations and give opinion testimony on the significance of evidence they have collected, absent any cautionary instruction, threatens the fairness, integrity, and public reputation of judicial proceedings, regardless of whether the defendant is actually innocent." *Id*. at 745.  *Lopez-Medina*, however, is not binding in this Circuit and, as such, cannot be used to support an argument that the district court clearly and obviously erred.

### C.    Molina cannot show that her substantial rights were affected by the district court's decision not to provide sua sponte a cautionary instruction.

Each of the identified witnesses properly testified as either lay witnesses, fact witnesses, or qualified expert witnesses.  Should this Court nevertheless find the district court failed to provide a cautionary instruction during the witnesses' testimony, that error does not rise to the level of affecting Molina's substantial rights. *See United States v. Gonzalez-Rodriguez*, 621 F.3d 354 at 363

(5th Cir. 2010) (noting that "an error affects a defendant's substantial rights only if the error was prejudicial," which requires the defendant to show "there is a reasonable probability that the result of the proceedings would have been different but for the error").

The evidence against Molina was significant, including the testimony from CW1 and CW2. These two witnesses provided substantial evidence about Molina's involvement in the drug trade and the conspiracy charged. (*See supra* Statement of the Case.) Moreover, the jury rejected Molina's implausible story that she did not know what she was doing when she met with CW1 to collect the kilogram of methamphetamine or that her uncle, using Molina's phone, was the one communicating with CW2. (*See id*.) The evidence supports Molina's conviction, and she has wholly failed to show an effect on her substantial rights sufficient to demonstrate plain error here.

**2.    The district court did not procedurally err in determining the drug quantity and purity based, in part, on the coconspirators' testimony.**

**<u>Standard of Review</u>**

"The district court's calculation of the quantity of drugs involved in an offense is a factual determination." *United States v. Alford*, 142 F.3d 825, 831 (5th Cir. 1998). "'Factual findings regarding sentencing factors are entitled to considerable deference and will be reversed only if they are clearly erroneous.'" *Id.* at 831 (quoting *United States v. Watson*, 966 F.2d 161, 162 (5th Cir.

24

1992)); *see also United States v. Medina*, 161 F.3d 867, 876 (5th Cir. 1998) ("We review drug quantity determinations, as findings of fact, for clear error."). "'A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole.'" *Alford*, 142 F.3d at 831 (quoting *United States v. Sanders,* 942 F.2d 894, 897 (5th Cir. 1991)); *see also United States v. Betancourt*, 422 F.3d 240, 246 (5th Cir. 2005).

## Discussion

At sentencing, Molina objected to the drug quantity attributed to her in the PSR, claiming that she should be held responsible for only five kilograms of methamphetamine. (ROA.1009.) The court, after hearing argument from the defense and government, overruled the objection, finding the drug amount in the PSR correct. (ROA.1011.) On appeal, Molina claims that the district court failed to make factual findings regarding the drug amount when it adopted the PSR without change. (Brief at 17.) Molina is wrong. The district court found the drug quantity in the PSR correct after discounting Molina's argument. The district court did not procedurally err when it relied on the PSR's drug quantity calculation.

A defendant who takes issue with facts presented in the PSR has the burden of demonstrating "that the information is materially untrue, inaccurate or unreliable." *United States v. Arayatanon*, 980 F.3d 444, 451 (5th Cir. 2020).

A defendant's mere objection at sentencing does not constitute competent rebuttal evidence. *Id.* A PSR's drug-quantity finding is sufficiently reliable even if based on a coconspirator's "imprecise" testimony, especially absent any competent rebuttal evidence from the defendant. *Id.* A district court can estimate the drug quantity, especially when there no drugs seized or the amount seized does not reflect the scale of the offense. *Betancourt*, 422 F.3d at 246-47; *see also* USSG § 2D1.1, comment. (n.12) ("Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance.").

Here, contrary to Molina's claim, the PSR and evidence presented at trial supported the drug-quantity determination. Although she argues that CW2's testimony about the number of kilograms was unreliable and conclusory, the text messages and photos in Molina's phone corroborated CW2's trial testimony that he delivered multiple kilograms of methamphetamine to Molina on multiple occasions. (*See supra* Statement of the Case.) The district court was entitled to credit CW2's testimony and find, by a preponderance of evidence, that Molina was responsible for 13 kilograms.

Molina's purity argument similarly fails. CW2 testified that he converted the methamphetamine he received from Mexico into crystal methamphetamine, and when he was arrested, he was found to be in

possession of methamphetamine with a purity of over 80%. (ROA.1414.)
CW1 also distributed methamphetamine with a purity of over 80%.
(ROA.1414.) The district court, therefore, did not err in finding Molina
responsible for "ice" methamphetamine, which is a "mixture or substance
containing d-methamphetamine hydrochloride of at least 80% purity." USSG
§ 2D1.1(c), n.(C); *see also United States v. Walker*, 688 F.3d 416, 418 n.2 (8th Cir.
2012) ("'Ice' is a purer, more potent form of methamphetamine."); *United
States v. Aparicio*, 963 F.3d 470, 474 (5th Cir.), *cert. denied*, 141 S. Ct. 435
(2020).

In *United States v. Rodriguez*, 666 F.3d 944, 947 (5th Cir. 2012), this Court
affirmed a district court's purity finding for unseized methamphetamine when
the purity was extrapolated from drugs seized. There, three methamphetamine
samples with a purity between 97.1% and 98.2% were seized. *Id.* Because the
same supplier provided both the seized and unseized drugs, the district court
did not err when it inferred that the unseized drugs had a similar purity as
those seized. *Id*.

In Molina's case, the district court properly inferred that the drugs
Molina received from CW2 and CW1 had a purity of 80% or higher—the
same purity as the meth seized from both. *Id.*; *see also United States v. Dinh*, 920
F.3d 307, 313 (5th Cir. 2019). Molina failed to refute the drug quantity and

purity with competent evidence and failed to carry her burden of

demonstrating that the PSR drug purity and quantity were "materially untrue,

inaccurate or unreliable." *United States v. Alaniz*, 726 F.3d 586, 619 (5th Cir.

2013); *see also United States v. Harris*, 702 F.3d 226, 230 (5th Cir. 2012);

*Betancourt*, 422 F.3d at 246. In light of this failure and the record as a whole,

the district court's finding that Molina was responsible for 13 kilograms of ice

methamphetamine was certainly plausible and does not constitute procedural

error. *Betancourt*, 422 F.3d at 246.

### 3. The district court did not impose a trial penalty when it sentenced Molina to a bottom-of-the-guidelines sentence.

<u>**Standard of Review**</u>

Molina complains that the district court imposed an unconstitutional

trial penalty when it sentenced her to a bottom-of-the-guideline sentence and

suggests this Court review her claim under the *de novo* standard of review.

(Brief at 21.) But Molina failed to object at sentencing on this ground, and so

the proper standard of review is plain error. *See United States v. Gozes-Wagner*,

977 F.3d 323, 335 (5th Cir. 2020); *United States v. Whitelaw*, 580 F.3d 256, 260

(5th Cir. 2009). In *Gozes-Wagner*, the defendant, likewise, complained that he

faced a "trial penalty," but unlike Molina, he argued at sentencing that he

should not be sentenced more harshly than his coconspirators who pleaded

guilty. *Id.* In determining the standard of review applicable, this Court

indicated that Gozes-Wagner's argument before the district court sufficiently triggered the more lenient *de novo* standard of review. *Id.* Nevertheless, under either a *de novo* or plain error standard of review, Molina's claim fails because the district court sentenced her to the bottom of the guideline range and adequately explained its reasons for that sentence.

## Discussion

Molina alleges that the district court imposed an improper trial penalty when it sentenced her to 292 months' imprisonment. (Brief at 21.) But the district court sentenced Molina to the bottom of the guideline range—which does not amount to a trial penalty. (ROA.1420.) The court's statements, to which Molina points, simply signify the court's rejection of Molina's request for a below-guidelines sentence, because unlike her codefendants who accepted responsibility by pleading guilty and admitting their involvement in the criminal activity, Molina went to trial and lied.

In *Gozes-Wagner*, this Court noted that defendants who go to trial are not similarly situated to those who plead guilty. 977 F.3d at 337. Specifically, the Court observed that "[w]e cannot compare apples to oranges when deciding whether a sentence is 'more severe' for trial penalty purposes," and a defendant "who cooperates with the Government is not similarly situated to one who refuses to do so." *Id.*; *see also United States v. Johnson*, 679 F.2d 54 (5th

Cir. 1982) ("The government is permitted to encourage guilty pleas by offering substantial benefits to a defendant, and Johnson, having rejected the offer of a plea bargain, cannot complain that his codefendants received the benefit of a lighter sentence.").  Molina, therefore, was not similarly situated to her codefendants who pled guilty, and the district court's decision to give her a heavier sentence than those defendants cannot be considered a per se trial penalty.  *Id.*

The district court here presided over a four-day jury trial—during which Molina testified—before sentencing Molina, which provided it with a full appreciation of Molina's character and conduct.  The evidence from the trial, together with Molina's implausible testimony at trial, gave the court a unique insight not only into Molina's character and lack of remorse, but also into her suitability for rehabilitation.  *Gozes-Wagner*, 977 F.3d at 337; *see also Alabama v. Smith*, 490 U.S. 794, 801 (1989) ("[I]n the course of the proof at trial the judge may gather a fuller appreciation of the nature and extent of the crimes charged. The defendant's conduct during trial may give the judge insights into his moral character and suitability for rehabilitation.").

The sentencing court here had significantly more information in determining an appropriate sentence for Molina than most courts do where there is no trial.  *Id.* at 337.  On appeal, Molina asserts that the district court

made clear that it was punishing her for going to trial and cites the district court's comments at sentencing that Molina declined a favorable plea offer from the government and chose to pursue a trial knowing there was significant evidence against her. (Brief at 22.) The district court in *Gozes-Wagner* also referenced the defendant's decision to go to trial several times, but this Court found the remarks were "designed to explain why someone in her position could receive a heavier sentence, not that she should receive a lengthier sentence for exercising her right to a trial." 977 F.3d at 338 n.11.

Likewise, the district court here referenced Molina's decision to forego a favorable plea offer before sentencing her to explain the sentence imposed, which was at the bottom of the applicable guideline range (a range calculated without a three-level acceptance of responsibility reduction). The court was not attempting to punish Molina more harshly by, for example, imposing an above-range sentence based on her decision to go to trial. The district court also noted Molina's lack of remorse and her continued deception when it imposed the guideline sentence—other facts the court was entitled to consider. As this Court has emphasized, that "although a district court's comments at sentencing are an important factor of our review, we must consider them in the context of the entire hearing. One [comment taken out of context] does not create error when it can be understood in the context of a lengthy sentencing

hearing." *Id*. at 340.   In sum, Molina received a bottom-of-the-guidelines sentence—which, if she were claiming substantive unreasonableness, would enjoy a presumption of reasonableness—and Molina has not demonstrated that it amounts to an impermissible trial penalty.

## **CONCLUSION**

This Court should affirm Molina's conviction and sentence.

Respectfully submitted,

Prerak Shah
Acting United States Attorney

*/s/ Suzanna Etessam*
Suzanna O. Etessam
Assistant United States Attorney
Texas Bar No. 17572420
1100 Commerce Street, 3rd Floor
Dallas, Texas 75242
Telephone: 214-659-8643
Suzanna.Etessam@usdoj.gov

Attorneys for Appellee

## CERTIFICATE OF SERVICE

I certify that this document was served on Molina's attorney, Cheri Thomas, through the Court's ECF system on September 27, 2021, and that: (1) any required privacy redactions have been made; (2) the electronic submission is an exact copy of the paper document; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Suzanna Etessam*
Suzanna O. Etessam
Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,835 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Calisto MT font.

*/s/ Suzanna Etessam*
Suzanna O. Etessam
Assistant United States Attorney
Date: September 27, 2021